**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| JOYCE FITCH, MARK MIXON, SHERRYREED ROBINSON, *and* ADRIANA BLAKEMAN, *individually and as elected officers and members of* THE CONCERNED CITIZENS OF TYRRELL COUNTY, <br><br> Plaintiffs, <br><br> v. <br><br> NATHAN EVERETT, NINA GRISWELL, JORDAN DAVIS, DOROTHY SPENCER, and ROBERT THOMPSON, *as elected officers of the* TYRRELL COUNTY BOARD OF COMMISSIONERS, <br><br> Defendants. | **COMPLAINT** <br> **(Jury Trial Demanded)** |

NOW COMES the Plaintiffs, the Concerned Citizens of Tyrrell County, by and through undersigned counsel, to bring this Complaint against the Defendants, the Tyrrell County Board of Commissioners.

## I.     NATURE OF THE CASE

1.     Tyrrell County owns and maintains a monument "IN APPRECIATION OF OUR FAITHFUL SLAVES" near the front door of the county's courthouse, where people attend court for civil and criminal cases and exercise their right to vote.

1

2.     The monument is believed to be the only courthouse monument in the United States of America to textually express a racially discriminatory message.

3.     This action challenges the County's maintenance of the monument as racially-discriminatory government speech that violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

## II.     JURISDICTION AND VENUE

3.     Plaintiff's case arises under the Constitution and laws of the United States, specifically, the Fourteenth Amendment to the United States Constitution.

4.     Plaintiff's suit is authorized by 42 U.S.C. § 1983 (allowing suit to address constitutional violations) and 42 U.S.C. § 1988 (providing for attorney's fees and litigation expense awards).

5.     This Court has jurisdiction over Plaintiff's federal constitutional claims under 28 U.S.C. §§ 1331 and 1343.

6.     All of the Defendants reside in Tyrrell County, North Carolina, and all the acts alleged herein occurred within the county; therefore, under 28 U.S.C. § 1391, venue is proper in the United States District Court for the Eastern District of North Carolina.

## III.     PARTIES

A.     *Plaintiff Organization*

7.     The Concerned Citizens of Tyrrell County ("CCTC" or "Concerned Citizens") is a membership-based, dues-paying civic organization based in Tyrrell County, North Carolina. The group has met continuously since at least the 1990s. Some trace the organization's lineage to the 1940s, when a cohort of Black citizens in the county first

2

organized a civic membership group with an aim to improve the quality of life for people in Tyrrell County and to address issues of importance to the county's Black residents. This remains the mission of the present day Concerned Citizens. Group members live in the county and range in age from their 40s to their 90s. They meet monthly in the county seat of Columbia and, throughout the year, sponsor and host a variety of events. Early 2024 events have included an MLK Day program at Columbia High School, attended by nearly 100 people, and a film screening of *Hidden Figures* at the county library to mark Black History Month. The group does not exclude any person from membership on account of race, and it has had a white member; however, historically and presently, membership has been almost exclusively Black. The group annually elects officers, who currently include Plaintiffs Mark Mixon, President; Joyce Fitch, Secretary; and Sherryreed Robinson, Treasurer. Because of CCTC's mission to address issues of importance to the county's Black residents, the group has long organized for, and committed significant resources to, the relocation of the Faithful Slaves monument away from the Tyrrell County Courthouse.

        B.    *Individual Plaintiffs*

      8.     Plaintiff Joyce Sykes Fitch is the Secretary of the Concerned Citizens of Tyrrell County. Mrs. Fitch was born in Tyrrell County in 1946 and raised in the county. Her family tree, both through her mother and father, is deeply-rooted in the area, and her ancestors lived in Tyrrell County before and throughout the American Civil War. Mrs. Fitch, a Black woman, attended segregated schools, graduating from Tyrrell High, the county's Black high school, in 1965. Growing up, Mrs. Fitch was aware the Ku Klux Klan had a presence in her area. Racial segregation was a feature of much of her early life. Mrs.

Fitch's brother, Ray, who currently lives next to her in the historically-Black neighborhood of Alligator in Columbia, NC, was in the last segregated class to graduate from Tyrrell High, a decade and a half after the U.S. Supreme Court's landmark ruling in *Brown v. Bd. of Ed. of Topeka, Shawnee Cnty., Kan.*, 347 U.S. 483 (1954). Mrs. Fitch attended Elizabeth City State College, had a long career in a variety of industries, and retired in 2016. For years as a member of the Concerned Citizens, Mrs. Fitch has spoken about the Faithful Slaves monument at County Commission meetings, helped to organize demonstrations and billboards calling for its relocation, and given interviews with media outlets to explain the group's opposition to the monument's presence at the Tyrrell County Courthouse.

9. Plaintiff Mark Mixon is the President of the Concerned Citizens of Tyrrell County. Mr. Mixon was born to a military family in Fort Lee, Virginia, is a U.S. Army veteran, was in the active service for fourteen years, and was stationed in South Korea. In 1995, he became a reserve officer, moved to Tyrrell County, and began working as a teacher. Mr. Mixon's late wife, Brenda, whom he met when they were students at Virginia State University, was born and raised in Tyrrell County, was active in the Concerned Citizens from the 1990s until her death in 2020, and formerly served as the organization's Secretary. Mr. Mixon is a resident of Columbia, North Carolina, the county seat of Tyrrell County, and for years has organized for and spoken publicly about the importance of relocating the Faithful Slaves monument from its position of prominence in front of the county courthouse.

10. Plaintiff Sherryreed Robinson is the Treasurer of the Concerned Citizens of Tyrrell County and one of the group's youngest members. She was raised in Tyrrell

4

County, and her family's lineage in the county dates to the 1800s. Ms. Robinson graduated from Columbia High School, is a married mother of three, and is a long-time business-owner in the county. She currently works at Audubon NC on a project to help the Northeastern part of the county with flooding and coastal resilience. For years, Ms. Robinson has engaged in efforts to persuade the Tyrrell County Commission to move the Faithful Slaves monument away from its position in front of the courthouse. She has engaged in this activity as a member of the Concerned Citizens and through her own group, Black Community United. While speaking publicly against the monument at the courthouse, Ms. Robinson has encountered armed supporters of the monument.

11.     Plaintiff Adriana Blakeman is a United States Air Force veteran and a member of the Concerned Citizens of Tyrrell County. She is the sister of Plaintiff Sherryreed Robinson. Ms. Blakeman was raised in Tyrrell County and, like her sister, has deep family roots there. Unlike the other Plaintiffs, Ms. Blakeman no longer lives in the county; however, she frequently travels there to visit family and friends. For years, Ms. Blakeman has been vocal at public demonstrations and in online discussions about her belief that the Faithful Slaves should be removed from the courthouse grounds. She has engaged in this activity as a member of the Concerned Citizens and through a group she organized with her sister, Black Community United. As a result of her advocacy against the monument, Ms. Blakeman was physically threatened and menaced with a truck by a man who supports maintaining the Faithful Slaves monument.

C.     *Defendants*

5

12.     The Defendant Tyrrell County Board of Commissioners ("Defendants," "Board," or "Board of Commissioners") is an elected body representing the people of Tyrrell County with policymaking authority for the county. Upon information and belief, the Board maintains, and at all times relevant to the claims maintained, insurance affording coverage to this action. Current commissioners include Chairman Nathan T. Everett, Vice Chairman Nina B. Griswell, and Commissioners Jordan R. Davis, Dorothy Spencer, and Robert Thompson. The Board has authority over the legal status and disposition of Tyrrell County's monument to Faithful Slaves. As the elected leaders of local government, the monument speaks for them. *See generally* discussion, *infra* § V.

## IV.     STATEMENT OF THE FACTS

13.     In 1902, Tyrrell County, North Carolina, unveiled a monument on a public lot that "serve[d] as the dividing line between the early twentieth century commercial area and the late nineteenth residential section" of Columbia, NC.[1]

14.     Depicting a Confederate soldier standing atop a pedestal and bearing tribute to "THE CONFEDERATE CAUSE," the top south-facing panel of the monument reads, "IN APPRECIATION OF OUR FAITHFUL SLAVES."

15.     The county placed the monument near what would soon be the steps of the Tyrrell County Courthouse, which opened and began holding court months later, in 1903.

---

[1] U.S. DEP'T OF INTERIOR, NAT'L PARK SERV., NAT'L REGISTER OF HISTORIC PLACES INVENTORY-NOMINATION FORM, COURTHOUSES IN NORTH CAROLINA, at 16 (1977).

16.     One hundred and twenty-one years later, the monument remains adjacent to the front doors of the historic Tyrrell County Courthouse, which continues to serve the public as one of the oldest operating courthouses in North Carolina.

17.     The Tyrrell County Board of Commissioners, as the elected representatives of Tyrrell County, control the disposition of the monument, the upkeep of which is maintained at county expense by county employees.

18.     The "Faithful Slaves" monument was a gift to Tyrrell County from the Tyrrell Monument Association, an organization created and led by William Fessenden Beasley, a merchant of Baltimore and former Lieutenant Colonel in the Confederate Army.

19.     Beasley was born in Tyrrell County into a large slave-holding family. He was a public figure of some prominence in North Carolina in the late nineteenth and early twentieth centuries, and in his lifetime, was perhaps best known nationally for challenging North Carolina's Chief Justice to "mortal combat" after a perceived slight.[2]

20.     With the cooperation of Tyrrell officials, Mr. Beasley engaged in efforts to secure private funds for the construction of a monument that would honor Tyrrell's Confederate soldiers and the county's so-called "faithful slaves."

21.     In addition to projecting a pro-slavery and pro-Confederate message, the monument also served as something of a vanity project for Beasley and his family, with one panel "lovingly dedicate[d]" to "the memory of Mary Alexander Beasley, who was born in Tyrrell County . . . [and] was the mother of Lt. Colonel W.F. Beasley."

---

[2] *Colonel Challenges Judge*, N.Y. TIMES, June 26, 1904, at A3.

7

22.     After Beasley and the Monument Association obtained the necessary funds and arranged for the monument's construction, Tyrrell County officials planned a public, formal acceptance ceremony.

23.     The event occurred on Thursday, August 7, 1902, and was attended by between 3,000 and 5,000 people, according to several regional newspapers that covered it. "Pages would not do justice," one wrote, "to this, the most momentous occasion ever celebrated in the county of Tyrrell. Never before in the annals of its history had many visitors swarmed the streets of its capitol."[3]

24.     The ceremony was attended by multiple Tyrrell officials. Mr. Beasley "presented the monument to Tyrrell [C]ounty in (sic) behalf of the Monument Association," and Mr. Mark Majette, an attorney who served in a variety of local government capacities, spoke on behalf of the county, delivering a "speech of acceptance."[4]

25.     Tyrrell's Register of Deeds, Mr. Thomas L. Jones, a former Confederate soldier, was present for the conveyance, and his daughter, Lula, unveiled the monument to the crowd.[5]

26.     The monument to Confederate soldiers and "Faithful Slaves" was among the earliest monuments erected in North Carolina to venerate the Confederacy. In the decades that followed, many counties would erect similar statues depicting a Confederate Soldier.

---

[3] THE TAR HEEL (Elizabeth City, NC), Aug. 8, 1902, at 1.
[4] *To the Boys in Grey: Unveiling of the Confederate Monument in Columbia,* THE FARMER & MECHANIC (Raleigh, NC), Aug. 15, 1902, at A3.
[5] Id. A number of these officials' names, including those of Mr. Majette and Mr. Jones, are inscribed on the monument itself, which identifies them as members of the Tyrrell County Monument Association's Executive or Finance Committees.

8

None, however, would include a textual endorsement of the institution of slavery—a tribute to "Faithful Slaves."

27.    Tyrrell's is the *only* monument to include such language at a courthouse—not just in North Carolina, but anywhere in the United States of America. It is one of two monuments located on public property in the U.S. purporting to celebrate "Faithful" or "Loyal Slaves"—the other being located in a park in Fort Mill, South Carolina.

28.    In the past five years, more than a dozen Confederate monuments have been removed,[6] many by way of votes from local boards of commissioners in response to an emerging consensus that the monuments are racially offensive, and despite a 2015 law passed by the North Carolina General Assembly aimed at preventing their removal.[7]

29.    In 2022, the Supreme Court of North Carolina held that the 2015 law, N.C.G.S. § 100-2.1, applies only to monuments "owned by the State" and does not apply to monuments, like the Faithful Slaves monument, which are owned by individual

---

[6] *See, e.g.*, Mackenzie Wicker, *Confederate Monument Removed from Buncombe Courthouse Property*, ASHEVILLE CITIZEN-TIMES, July 14, 2020 (discussing Commission's removal of the Vance monument in Buncombe County); Martha Quillin, *NC Town Takes First Step in Relocating Confederate Monument, Removing Solider from Top*, NEWS & OBSERVER, June 30, 2020 (discussing board vote to relocate monument from Main Street in Louisburg to town cemetery); Sharon Danquah and Annette Weston, *Kinston Confederate Monument to be Moved to Civil War Memorial Site*, WCTI-12, June 25, 2020 (discussing Lenoir Commissioners' unanimous vote to relocate Confederate monument to a Civil War battleground); Amber Lake, *Pitt County Discusses Confederate Monument Removal*, WITN-TV, Sept. 13, 2021 (discussing unanimous vote of Pitt County Commissioners to remove county's Confederate monument from public property); Gary Band, *Confederate Monument Removed from Courthouse Square*, *Warren Record*, June 24, 2020 (discussing unanimous vote of the Warren County Commissioners to remove county's Confederate monument from courthouse property); Derrick Bryson Taylor, *Confederate Statue in North Carolina Comes Down After 112 Years*, N.Y. TIMES, Nov. 20, 2019 (discussing vote of Chatham County Commissioners to remove Confederate monument from courthouse grounds).
[7] N.C. GEN. STAT. § 100-2.1.

9

counties.[8] In so holding, the Court observed that "the North Carolina Constitution authorizes counties and municipalities to own property independently of the State" and that "the General Assembly has specifically authorized counties" to do so.[9]

30.     Tyrrell County's monument communicates, on behalf of local government, the idea that Black people who were enslaved in Tyrrell County preferred their slavery to freedom.

31.     The county's erection and maintenance of the monument communicates, on behalf of local government, the idea that Tyrrell's institutions regard Black people's rightful place as one of subservience and obedience.

32.     As one national publication explained it, the monument's "placement on the grounds of the Tyrrell County Courthouse was intended to send an ominous message to every black person with the misfortune of seeking justice in its halls."[10]

33.     For years, Plaintiffs, the Concerned Citizens of Tyrrell County, a dues-paying membership group comprised of predominately elderly Black residents from the county, has publicly called for the Faithful Slaves monument's removal from courthouse grounds. The Concerned Citizens have committed significant time, energy, and resources to their efforts to persuade the County Commission to relocate the monument.

---

[8] <u>United Daughters of the Confederacy v. City of Winston-Salem by & through Joines</u>, 383 N.C. 612, 641–42, 881 S.E.2d 32, 54–55 (2022).

[9] <u>Id.</u>

[10] Kali Holloway, *'Loyal Slave' Monuments Tell a Racist Lie About American History*, THE NATION, March 25, 2019; *see also* <u>Hunter v. Underwood</u>, 471 U.S. 222, 228–29 (1985) (stating that, in 1901, "a movement . . . swept the post-Reconstruction South to disenfranchise blacks," that "zeal for white supremacy ran rampant," and lawmakers "were not secretive about their purpose").

10

34.     Plaintiffs have organized public marches and demonstrations against the monument. They have written letters to the editor of local newspapers. They have given interviews to local and state media. They have attended Board of Commissioners meetings and repeatedly spoken during the public comment section in support of the monument's relocation. They have arranged with the Commission to have dedicated time on the board's agenda, and they have given presentations to Defendants about the issue and its importance. CCTC has sought the assistance of other groups to build public support for their campaign. They have erected billboards—two of them—at prominent locations on the way into Columbia, calling for the monument's removal. They have enlisted the assistance of attorneys to engage with the Tyrrell County Manager and Attorney about the issue and to address the board on their behalf.

35.     Plaintiffs, who are of modest means, have devoted what resources they have, and have expended considerable efforts, to persuade Defendants to remedy what they maintain is Defendant's ongoing violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution. To date, none of these efforts have been successful.

36.     As a result of their advocacy in opposition to Defendants' racially-discriminatory government speech, Plaintiffs have been subjected to acts of intimidation.

37.     In one instance, after speaking at a public demonstration in opposition to the monument, Plaintiff Blakeman was threatened by a man who repeatedly menaced her with a truck bearing the Tyrrell County emblem, passing her multiple times, while she was out running alone. The incident culminated with Blakeman being forced to flee from the road because the man steered in her direction and attempted to hit her with the truck. Upon

information and belief, the incident occurred because of Plaintiff's public advocacy in support of relocating the Faithful Slaves monument.

38.     In another instance, Plaintiffs obtained a permit from the Sheriff of Tyrrell County, Kevin Sawyer, to hold a public demonstration featuring speakers in opposition to the Faithful Slaves monument. During the permit application process, Sheriff Sawyer told Plaintiff Robinson no one would be permitted to carry firearms while speaking or participating in a protest. Plaintiffs complied with this instruction. However, during the demonstration, a white supporter of the Faithful Slaves monument, armed with a handgun, took control of Plaintiffs' podium and delivered remarks.[11] When Plaintiff Robinson told Sheriff Sawyer the man was armed with a firearm on the courthouse steps, in violation of the prohibitions against carrying weapons, both at public protests and on courthouse grounds, the sheriff responded that he knew the man and did not regard his gun as an issue.[12]

39.     The county has overlooked these real threats to public safety while unreasonably treating Plaintiffs' peaceful opposition to the Faithful Slaves monument as if

---

[11] It is "reasonable to assume . . . carrying firearms in connection with [public] protests conveys intimidation rather than free expression[.]" Antonyuk v. Chiumento, 89 F.4th 271, 378 (2d Cir. 2023).

[12] The sheriff's unequal application of restrictions on firearms in this instance recalls the state of the law in North Carolina before the Civil War and through the post-Reconstruction era, when Black people were made to seek pre-approval from county officials before they could carry guns and white people were not. See, e.g., State v. Dempsey, 31 N.C. 384, 385–88 (1849) (affirming conviction for violating statute that prohibited "any free negro, mulatto, or free person of color" from "carry[ing] . . . any shot gun or other arms" without prior approval of the county court); D.C. v. Heller, 554 U.S. 570, 614 (2008) ("Blacks were routinely disarmed by Southern States after the Civil War. Those who opposed these injustices frequently stated that they infringed blacks' constitutional right to keep and bear arms.").

it were itself a threat to public safety, at one point shutting down businesses and the public library in Columbia, NC, purportedly as a precautionary safety measure, when Plaintiffs organized a peaceful march.

40.     The county's discriminatory and unreasonable reaction to protests and counter-protests has created a risk that Plaintiffs will face physical intimidation and danger when and if they speak against the monument at the Tyrrell County courthouse[13]—the seat of government, a place Plaintiffs go to vote, to serve jury duty, to file important documents, to meet with public employees, and to participate in civic life.[14]

41.     It is only after having exhausted all reasonable efforts to resolve the issue without litigation that Plaintiffs come to this honorable Court in search of relief.

## V.     CLAIM FOR RELIEF
### Racially-Discriminatory Government Speech in Violation of
### the Equal Protection Clause of the Fourteenth Amendment
### 42 U.S.C. § 1983

42.     The U.S. Supreme Court has repeatedly said that "the government must remain neutral in the marketplace of ideas."[15]

43.     Prior rulings from this Court, the federal courts of appeal, and lower courts make clear that the government, when it speaks, may not express a racially hostile or

---

[13] *Cf.* Pinder v. Johnson, 54 F.3d 1169, 1180 (4th Cir. 1995) (discussing "the state's clearly established duty to protect an individual where the state, through its affirmative action, has created a dangerous situation or rendered the individual more vulnerable to danger").

[14] *Cf.* Roberts v. U.S. Jaycees, 468 U.S. 609, 624–25 (1984) (stating that government endorsement of "stereotypical notions" about identifiable groups "deprives persons of their individual dignity and denies society the benefits of wide participation in political, economic, and cultural life").

[15] Hustler Magazine v. Falwell, 485 U.S. 46, 56 (1988) (quoting FCC v. Pacifica Foundation, 438 U.S. 726, 745–46 (1978)).

13

discriminatory message, and that if it does, it can be challenged, like other violations of equal protection, through 42 U.S.C. § 1983.[16]

44.    The U.S. Supreme Court has held that "privately financed and donated monuments that the government accepts and displays to the public on government land" should be understood as "a means of expression," designed to "convey some thought or instill some feeling in those who see the structure."[17]

45.    The Supreme Court has held such monuments, which include Tyrrell County's monument to Faithful Slaves, amount to "government speech."[18]

46.    When the government speaks, the Fourteenth Amendment to the U.S. Constitution acts as a limitation on its ability to express a racially-hostile or discriminatory message. This limitation has particular salience with respect to governmental expression at

---

[16] *See, e.g.*, Pleasant Grove City, Utah v. Summum, 555 U.S. 460, 482 (Stevens, J., concurring) (stating that the government does not have "free license to communicate offensive . . . messages" because government speech is "bound by the . . . Equal Protection Clause[]"); Anderson v. Martin, 375 U.S. 399, 402 (1964) (holding equal protection clause was violated when a State, by way of rules governing the publication of ballots, communicated the message "that a candidate's race or color is an important—perhaps paramount—consideration" (emphasis added)); Hunter v. Underwood, 471 U.S. 222, 233 (1985) (holding that government action "violates equal protection" if it "was motivated by a desire to discriminate against blacks on account of race and . . . continues to this day to have that effect"); R.J. Reynolds Tobacco Co. v. Bonta, 272 F. Supp. 2d 1085, 1108–09 (E.D. Cal. 2003) (stating that "the Equal Protection Clause may provide substantive limitations on government speech").

[17] Pleasant Grove City, Utah v. Summum, 555 U.S. 460, 470–71 (2009).

[18] Id. at 470.

a courthouse,[19] because people expect courts to maintain a sense of decorum, provide due process, and afford equal protection under the law.[20]

47.     Courthouses occupy a unique position as a forum for speech,[21] and government-sponsored displays at courthouses may be unconstitutional specifically because of their expressive content.[22]

48.     The U.S. Supreme Court has described the scope of the Equal Protection Clause as "deep" and "broad" and has said that the Clause "nullifies and makes void . . . *State action of every kind* . . . which denies to any [citizen] the equal protection of the laws."[23]

---

[19] *Cf.* State v. Gilbert, No. M202001241CCAR3CD, 2021 WL 5755018, at *17–21 (Tenn. Crim. App. Dec. 3, 2021) (reversing criminal conviction, finding defendant was prejudiced by jury's exposure to Confederate memorabilia at county courthouse; noting display on courthouse wall gave it "the imprimatur of state approval" (citing Walker v. Texas Div., Sons of Confederate Veterans, Inc., 576 U.S. 200, 217 (2015)).

[20] *Cf.* United States v. Young, 470 U.S. 1, 10 (1985) (emphasizing the court's "responsibility to maintain decorum"); Gannett Co. v. DePasquale, 443 U.S. 368, 378 (1979) (discussing courts' responsibility to "safeguard the due process rights of the accused" as an "affirmative constitutional duty").

[21] *See, e.g.*, Huminski v. Corsones, 396 F.3d 53, 90–91 (2d Cir. 2005) (stating that a courthouse is a "staid environment" that exists to "facilitate the smooth operation of a government's judicial functions"; it is not a place for expressive activity, and courts "must ensure that [it] is a place in which . . . disinterested judgment will not be disrupted" (quoting Berner v. Delahanty, 129 F.3d 20, 26 (1st Cir. 1997), *cert. denied,* 523 U.S. 1023)); *see also* Hodge v. Talkin, 799 F.3d 1145, 1162–63 (D.C. Cir. 2015) (affirming lawfulness of statute proscribing displays of signs on Supreme Court grounds, finding the statute "helps maintain the decorum and order befitting courthouses generally" and that "'it is proper to weigh the need to maintain the dignity and purpose of a public building'" (quoting U.S. v. Kokinda, 497 U.S. 720, 738 (1990) (Kennedy, J., concurring in judgment)).

[22] *See, e.g.*, Cty. of Allegheny v. ACLU, 492 U.S. 573, 578–79, 600–01 (1989) (holding display of creche in a county courthouse violated Establishment Clause because it expressly endorsed a Christian message).

[23] Civil Rights Cases, 109 U.S. 3, 10–11 (1883) (emphasis added).

49.     Consistent with this broad conception of the Clause's reach, the Court has held the Equal Protection Clause renders "illegitimate" government actions that are rooted in "archaic and stereotypic notions" about protected groups.[24]

50.     Although Defendant Commissioners have asserted that N.C. Gen. Stat. § 100-2.1, a state monument preservation law, precludes them from moving the Faithful Slaves monument,[25] the federal constitutional guarantee of equal protection defeats and invalidates the application of any state statute that serves to effectuate discriminatory state action.[26]

51.     The U.S. Supreme Court has indicated, through many eras of its history, that the Equal Protection Clause is violated when the government *expresses the idea* that one group of people, defined by shared and innate characteristics, are inferior to another group of people.[27]

---

[24] Mississippi Univ. for Women v. Hogan, 458 U.S. 718, 724–25 (1982).

[25] Where it is clear, as it is here, that the county owns a monument, the Supreme Court of North Carolina has rejected the argument that N.C. Gen. Stat. § 100-2.1 prevents the county from moving it. United Daughters of the Confederacy v. City of Winston-Salem by & through Joines, 383 N.C. 612, 641–42, 881 S.E.2d 32, 54–55 (2022).

[26] Weber v. Aetna Cas. & Sur. Co., 406 U.S. 164, 175–76 (1972); Reed v. Reed, 404 U.S. 71, 74 (1971); Glona v. Am. Guarantee & Liab. Ins. Co., 391 U.S. 73, 75–76 (1968). Here, the Thirteenth Amendment to the U.S. Constitution may have similar effect. Pursuant to its powers under the Thirteenth Amendment, Congress in 1866 prohibited racial discrimination in all real property transactions, public and private. Jones v. Alfred H. Mayer Co., 392 U.S. 409, 412–13 (1968). The Court has not indicated whether public maintenance of a fixture to real property that expressly affirms slavery or racial discrimination violates the Thirteenth Amendment, but it has held the Amendment prohibits the "badges and incidents of slavery." *See* Civil Rights Cases, 109 U.S. 3, 20–21 (1883) (stating Thirteenth Amendment "has a reflex[ive] character . . . decreeing universal civil and political freedom" and that its intention was to abolish slavery and "all badges and incidents of slavery in the United States").

[27] *See, e.g.*, Strauder v. State of W. Virginia, 100 U.S. 303, 307–08 (1879) (invalidating, under the Equal Protection Clause, a law excluding Blacks from jury service, and holding the Clause contains "a necessary implication of a positive immunity" that shields Blacks from being subjected

16

52.     In this case, the government of Tyrrell County has erected, continues to maintain, and for years has resisted repeated efforts to remove a monument at its courthouse that expresses an "archaic and stereotypic notion" about Black people, including Plaintiffs' family members, as "Faithful Slaves."

53.     Whereas "[m]ost Confederate monuments would likely be considered 'facially neutral' for Fourteenth Amendment purposes," because they "do not generally draw a distinction between people based on racial categories,"[28] the same cannot be said of the Tyrrell monument, which textually affirms the enslavement of Black people.

54.     As one federal court opinion recently noted, the "image of the faithful slave" is "mytholog[y]" and part of a narrative that "denied the horrors of slavery" and "fueled white backlash against . . . the rights . . . granted to African-Americans."[29]

---

to government acts that have the effect of "*implying inferiority* in civil society" (emphasis added)), *abrogated on other grounds by* Taylor v. Louisiana, 419 U.S. 522 (1975); Anderson v. Martin, 375 U.S. 399, 402 (1964) (holding Equal Protection Clause was violated when a State, by way of rules governing the publication of ballots, communicated the message "that a candidate's race or color is an important—perhaps paramount—consideration"); Romer v. Evans, 517 U.S. 620, 634–35 (1996) (invalidating state constitutional amendment prohibiting laws designed to protect gay people from discrimination, and concluding that if "the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare . . . desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest.'" (quoting Department of Agriculture v. Moreno, 413 U.S. 528, 534 (1973)).

[28] Aaron D. Sanders, *If Confederate Statues Could Talk: Durham's Monuments and Government Speech*, 45 SETON HALL LEGIS. J. 109, 115 (2021).

[29] Defend Arlington v. United States Dep't of Def., No. CV 23-2094 (BAH), 2023 WL 8600567, at *4 (D.D.C. Dec. 12, 2023) (quoting the 2021 NDAA Naming Commission's Final Report to the Committees on Armed Services of the Senate and House of Representatives); *see also* Micki McElya, CLINGING TO MAMMY: THE FAITHFUL SLAVE IN TWENTIETH-CENTURY AMERICA (Harvard Univ. Press 2007) (exploring how assertions of Black people's purported contentment with slavery through the propagation of the "faithful slave" narrative served to reinforce a system of racial hierarchy).

55.     Today, it is the expectation of the people of North Carolina that Black people will have those rights safeguarded when they enter state courthouses, including in Tyrrell County. That was not the expectation of the general public in 1902 when the Faithful Slaves monument was erected at the courthouse.

56.     The point of putting such a monument near the door of the Tyrrell County Courthouse was to remind Black people that the county's institutions saw their rightful place as one of subservience and obedience, and to suggest to them that they could not and would not get justice in the courts.[30]

57.     It is thus reasonable for Black people, including Plaintiffs, or *any* people, to look at Tyrrell County's monument to "Faithful Slaves" and to view it as an expression of racial hostility and an affirmation of racial discrimination.

58.     It is also reasonable to view the monument as expressing the idea that Black people who were enslaved in Tyrrell County preferred slavery to freedom.

59.     These are both offensive—and racist—ideas for the government to express.

60.     Such expression, which is communicated by, on behalf of, and at the local seat of government, makes a mockery of the U.S. Constitution's commitment to equal justice under the law.

61.     Even if there was another way to interpret the monument, the message that is *received* by the public when the government speaks is relevant to this court's analysis regarding the lawfulness of that speech.

---

[30] *See* Holloway, *'Loyal Slave' Monuments*, *supra* note 10.

18

62. The U.S. Supreme Court has indicated that whether a monument located on public land is reasonably viewed as expressing a racially-discriminatory message can bear on its lawfulness.[31] It has also made clear that "hearts and minds" matter in the context of equal protection law.[32]

63. In recent years, the Court has said it is reasonable to interpret Confederate imagery—specifically, the Confederate battle flag—as racially offensive.[33]

64. If the Confederate flag, which remains ubiquitous throughout the American South, is reasonably viewed as racially offensive, a courthouse monument to "Faithful Slaves" is as well.

65. Plaintiffs view the message expressed by the monument as an affirmation of racial discrimination and subjugation, and as detailed in the section below, this message has caused them specific and cognizable injuries.

66. These observations about how the government's expression is *received* bear relevance as to the monument's discriminatory *effect* on those who receive its message.

67. However, the U.S. Supreme Court has held that discriminatory effect "is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution,"

---

[31] In an Establishment Clause case upholding the Bladensburg Cross memorial, the court determined the monument had effectively "become part of the community" and found it significant that it "included the names of both Black and White soldiers," thus rejecting "disparaging intimations [about the monument's alleged racist intent as having] no evidentiary support." Am. Legion v. Am. Humanist Ass'n, __ U.S. __, __, 139 S. Ct. 2067, 2089–90 (2019).

[32] *See* Brown v. Bd. of Ed. of Topeka, Shawnee Cnty., Kan., 347 U.S. 483, 494 (1954) (stating that separating children "solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone").

[33] Walker v. Texas Div., Sons of Confederate Veterans, Inc., 576 U.S. 200, 206 (2015).

and a plaintiff pleading a violation of the Equal Protection Clause must also demonstrate discriminatory intent.[34]

68. The Court has said that when attempting to discern whether the government has acted with discriminatory intent, "contemporary statements by members of the decision-making body, minutes of its meetings, or reports" may be "highly relevant."[35]

69. In the case of Tyrrell County, the monument unambiguously expresses a racially-discriminatory message: The county "appreciat[es] . . . faithful slaves."[36]

70. Contemporaneous records from the time also unambiguously indicate the county's purpose in erecting it was motivated by racial animus.

71. The monument's dedication was marked by a speech from Thomas Gregory Skinner, a U.S. Congressman and veteran of the Confederate States Army who, like Mr. Beasley, the monument's benefactor, came from a local slaveholding family.[37] Skinner's remarks were described as a "masterly defense of the cause of the South" and received by "a crowd estimated at 3,000 people"[38]—approximately the same number of people as live in Tyrrell County today.[39]

---

[34] Washington v. Davis, 426 U.S. 229 (1976).

[35] Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 268 (1977).

[36] As discussed *supra* in notes 10, 29, and 30, and the accompanying text, the racist and discriminatory nature of the "faithful slave" mythology is well-established.

[37] *See* THE DESCENDANTS OF RICHARD SKINNER OF NORTH CAROLINA (1958), http://archive.org/stream/descendantsofric00wahl/descendantsofric00wahl_djvu.txt.

[38] *Tyrrell County Confederate Memorial, Columbia*, Commemorative Landscapes, DOCUMENTING THE AMERICAN SOUTH COLLECTION, UNIV. OF N.C. LIBRARIES.

[39] By population, Tyrrell is the smallest of North Carolina's 100 counties. *See* U.S. CENSUS, QUICK FACTS, TYRRELL COUNTY, N.C. (reporting a total population of 3,245 and a Black population of 938, or approximately 29%, at the 2020 Census).

72. The historical record indicates that the monument's "placement on the grounds of the Tyrrell County Courthouse was intended to send an ominous message to every black person with the misfortune of seeking justice in its halls."[40]

73. This is discriminatory intent sufficient to satisfy the intent prong of an equal protection claim.

74. Nothing has happened between 1902 and the present day that would legitimize, or that renders irrelevant for equal protection analysis purposes, the original racially-discriminatory intent that motivated the erection of the Faithful Slaves monument.[41] Even in the modern era, it is not uncommon for federal courts to determine that government actions or policies, which went into effect decades—or even close to a century—earlier, violate the Fourteenth Amendment.[42]

## Plaintiffs' Injuries

75. Defendant's racially-discriminatory speech has caused the Plaintiffs injuries, individually and organizationally, that are sufficient to confer standing upon them to bring suit.

---

[40] Holloway, *'Loyal Slave' Monuments*, *supra* note 10.

[41] *See, e.g.*, Hunter v. Underwood, 471 U.S. 222, 232–33 (1985) (rejecting assertion that "events occurring in the succeeding 80 years had legitimated [a racially-discriminatory act]," holding that "it violate[d] equal protection" because "its original enactment was motivated by a desire to discriminate against blacks on account of race and . . . continues to this day to have that effect"); Harness v. Watson, __ U.S. __, __143 S. Ct. 2426, 2426 (2023) (Jackson, J., dissenting from denial of certiorari) ("The Court of Appeals for the Fifth Circuit properly recognized that, under this Court's settled precedent, the mere passage of time cannot insulate from constitutional challenge a law that was invidious at its inception.").

[42] *See, e.g.*, *Hunter*, 471 U.S. at 233 (84 years); Lawrence v. Texas, 539 U.S. 558, 578 (2003) (40 years).

21

76.    The Plaintiffs are not "concerned bystanders."[43] Their grievance "is not a generalized claim of the right possessed by every citizen, to require that the Government be administered according to law."[44] Instead, there is a "direct causal relationship between the government's alleged deprivation of [Plaintiff]'s right to equal protection and [the Plaintiffs' injuries]."[45]

77.    Specifically, Plaintiffs have suffered "dignitary harms . . . sufficiently concrete to serve as injuries in fact,"[46] as well as threats to their physical safety because of the monument, which have functioned to inhibit their participation in civic life.

78.    The situation in Tyrrell County is not akin to "[a] black person in Hawaii . . . challeng[ing] . . . racially discriminatory [state action] in Maine."[47] Here, there is no "geographic separation between the challenged conduct and the stigmatic injury [that] reduce[s] the 'personal' impact of the injury [or] render[s] it too 'abstract.'"[48]

79.    Instead, Plaintiffs are among the county's small Black population, which numbers less than 1,000,[49] and they are the direct descendants of people whom the Defendants, by way of the monument, are *talking about*.

80.    By indicating that Black people who were enslaved in Tyrrell County preferred slavery to freedom, Defendants' speech "perpetuat[es] 'archaic and stereotypic

---

[43] Griffin v. Dep't of Lab. Fed. Credit Union, 912 F.3d 649, 654 (4th Cir. 2019) (quoting Allen v. Wright, 468 U.S. 737, 756 (1984)).
[44] Heckler v. Mathews, 465 U.S. 728, 740 n.9 (1984) (internal quotations and citations omitted).
[45] Id.
[46] *Griffin*, 912 F.3d at 654.
[47] Id. (quoting *Allen*, 468 U.S. at 757).
[48] Id. (quoting *Allen*, 468 U.S. at 756–57).
[49] *See supra* note 37.

notions'" that "stigmatiz[e]" Plaintiffs "as 'innately inferior' and therefore as less worthy participants in the political community."[50] This is a "serious non-economic injur[y]" that the U.S. Supreme Court has held is sufficient to confer standing to bring suit.[51]

      81. Defendants' maintenance of a monument espousing a racially-discriminatory message at the seat of local government has also "perceptibly impaired [CCTC's] ability" to improve resources and the quality of life of Black people in Tyrrell County.[52] CCTC's resources as an organization have been depleted because, for years, CCTC has been "forced to divert its valuable and limited resources away from its core mission . . . in order to respond to, mitigate, and address"[53] the harms caused by Defendant's racially-discriminatory speech. CCTC has expended resources to host demonstrations and speeches at the site of the monument, erected billboards calling for the monument's removal, regularly devoted time at its meetings to address the monument and its effect on the community, and spent time speaking at Commission meetings advocating for the monument's relocation.[54] As a result, CCTC has been able to devote less attention to other issues that are central to its mission.

---

[50] Heckler v. Mathews, 465 U.S. 728, 739–40 (1984) (quoting Mississippi Univ. for Women v. Hogan, 458 U.S. 718, 725 (1982)).

[51] Id.

[52] Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982) (holding it was error "to dismiss for lack of standing the claims of [the] organization in its own right" where defendant's practices "perceptibly impaired [organization's] ability" to achieve its mission).

[53] N. Carolina State Conf. of NAACP v. N. Carolina State Bd. of Elections, 283 F. Supp. 3d 393, 402 (M.D.N.C. 2017) (holding NC NAACP satisfied the requirements of organizational standing because it was forced to divert significant resources away from its core mission to address Defendants' unlawful practices).

[54] Havens, 455 U.S. at 379 (stating that plaintiff "had to devote significant resources to . . . counteract the defendant's racially discriminatory . . . practices," and "there can be no question that the organization has suffered an injury in fact" sufficient to confer standing).

82.     This case also presents issues of public safety.[55] In addition to suffering dignitary injuries, Plaintiffs have been subjected to acts of physical and racial intimidation because of Defendant's racially-discriminatory government speech. These acts have chilled Plaintiffs' exercise of their First Amendment rights and inhibited their ability to fully participate in civic life, including participation in public demonstrations that are central to the mission of the CCTC.

83.     In one instance, Plaintiff Blakeman was threatened by a man who menaced her with a truck bearing the Tyrrell County emblem, in an act of racial intimidation, while she was out running alone. The incident culminated with Blakeman being forced to flee from the road as the man attempted to hit her with the vehicle.

84.     In another incident, a man armed with a handgun took control of Plaintiffs' podium during a permitted demonstration and delivered remarks in support of the

---

[55] In recent years, Confederate monuments across North Carolina have been the sites of violent clashes resulting in physical injuries and criminal assault charges. *See, e.g.*, Barry Yeoman, *N.C. Pastor Who Led Halloween March to the Polls is Charged With Felony Assault*, WASH. POST, Nov. 20, 2020 (reporting on assault on officer charges filed against pastor allegedly involved in a confrontation during march that "stopped near the Confederate monument that fronts the Alamance County Courthouse"); Christian Galvano, *2 Men Arrested Following Dispute with Elon Professors at Confederate Monument*, ELON NEWS NETWORK, June 21, 2020 (detailing disorderly conduct and assault on a female charges filed against men arrested "after an altercation . . . near a Confederate monument outside the Alamance County courthouse"); Michael Perchick, *Man Charged During Confederate Monument Protest in Raleigh*, WRAL, Feb. 10, 2019 (detailing assault charge filed against man allegedly involved in confrontation between monument protesters and counter-protesters); Alfred Charles, *UNC-CH Professor Facing Assault Charge From Night Silent Sam Was Toppled*, WRAL, Sept. 5, 2018 (detailing assault charges filed against protester— one of "more than a dozen people" charged in connection with toppling of Confederate monument in Orange County); Abbie Bennett, *Duke Lecturer Charged With Assaulting Officer at 'Confederate Memorial Day' Event*, NEWS & OBSERVER, May 23, 2017 (detailing felony charge filed against protester involved in clash in front of monument between "neo-Confederate" group and group with "ties to socialist and anarchist labor movements").

monument while on the courthouse grounds. The man faced no repercussions from county law enforcement, who were present for the incident and who had previously instructed Plaintiffs that weapons were not permitted at demonstrations.

85.     The U.S. Supreme Court has recognized that one of the harms of state-based racial distinctions is they "threaten to stigmatize individuals by reason of their membership in a racial group and to *incite racial hostility*."[56] Here, Tyrrell County's maintenance of a public monument expressing a racially-discriminatory message has done precisely that.

86.     By espousing a racially-offensive message, in physical form, the county has "incite[d] racial hostility," endangered the Plaintiffs' safety, and caused injuries, separate and apart from Plaintiff's aforementioned injuries, that are sufficient to confer standing and jurisdiction for this Court to act.

## VI.     PRAYER FOR RELIEF

69.     WHEREFORE, the Plaintiffs pray that the Court enter judgment on their behalf and order the following relief:

   A. Declaratory relief, to include an order that Tyrrell County, through a public monument, may not express a racially-discriminatory message on its courthouse grounds;

---

[56] Johnson v. California, 543 U.S. 499, 507 (2005) (emphasis in original) (citation and quotation omitted); *cf.* R.A.V. v. City of St. Paul, 505 U.S. 377, 424–25 (1992) (Stevens, J., concurring in the judgment) (acknowledging the heightened "risk of injury or breach of peace created by race-based threats").

25

B. Injunctive relief, to include an order directing the Defendants to remove the Faithful Slaves monument from the grounds of the Tyrrell County Courthouse;

C. Pre-judgment and post-judgment interest and recovery of costs, as well as reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988, and other applicable laws; and

D. Any other and further relief the Court deems equitable and just.

## JURY DEMAND

70.     The Plaintiffs request a jury trial on all issues of fact that may arise from the pleadings.

Respectfully submitted, this the 21st day of May, 2024,


*/s/Ian Mance*
Ian A. Mance
N.C. Bar No. 46589
EMANCIPATE NC
Post Office Box 309
Durham, North Carolina 27702
Tel: (828) 719-5755
Email: ian@emancipatenc.org
*Attorney for the Plaintiffs*


_____
Jaelyn D. Miller
N.C. Bar No. 56804
EMANCIPATE NC
Post Office Box 309
Durham, North Carolina 27702
Tel: (919) 682-1149
Email: jaelyn@emancipatenc.org
*Attorney for the Plaintiffs*

26